IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANGEL FRANQUI-PAGAN, | : | CIVIL ACTION NO. 3:15-cv-1984 |
| Plaintiff | : | (Judge Munley) |
| v. | : | |
| JOHN JACKSON, | : | |
| Defendant | : | |

## MEMORANDUM

Plaintiff Angel Franqui-Pagan ("Franqui-Pagan" or "Plaintiff"), a state inmate who, at all times relevant, was incarcerated at the State Correctional Institution at Benner ("SCI-Benner"), Bellefonte, Pennsylvania, commenced this action on October 13, 2015. (Doc. 1). The sole defendant in the action is Sergeant John Jackson ("Jackson").

Presently pending is Jackson's motion (Doc. 48) for summary judgment pursuant to Federal Rule of Civil Procedure 56(a).[1] A brief (Doc. 49) in support of the motion, statement of material facts (Doc. 51), and supporting exhibits (Doc. 50) were filed on that same date. Franqui-Pagan failed to oppose the motion. An

---

[1] Jackson originally filed a motion for summary judgment on October 5, 2016, which was deemed withdrawn for failure to file a supporting brief. (Doc. 44). Jackson then filed a second motion for summary judgment on November 11, 2016, accompanied by a *nunc pro tunc* motion to deem the motion timely filed. (Docs. 48, 52). The Court denied the motion to deem the summary judgment motion timely filed, struck the summary judgment motion, and scheduled the matter for a pre-trial conference. Following the pretrial conference, the Court reinstated the motion for summary judgment. (Doc. 61).

order issued directing Plaintiff to file both a brief in opposition to the motion and a statement of material facts specifically responding to Defendant's statement. (Doc. 63). He was cautioned that his failure to file a brief and statement of material facts would result in the motion being deemed unopposed and Defendant's statement of material facts being admitted. (Id. at ¶¶ 1, 4). Franqui-Pagan has failed to file either an opposition brief or a statement of material facts. Consequently, the motion is deemed unopposed and Defendant's statement of material facts is deemed admitted

For the reasons set forth below, the motion for summary judgment will be deemed unopposed and granted.

## I.  Standard of Review

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)

(emphasis in original); Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Id.; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 257; Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996). Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. FED. R. CIV. P. 56; Celotex, 477 U.S. at 324; Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); Wooler v. Citizens Bank, 274 F. App'x 177, 179 (3d Cir. 2008). The party opposing the motion must produce evidence to show the existence of every

3

element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323; see also Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992). "[T]he non-moving party 'may not rely merely on allegations or denials in its own pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial.'" Picozzi v. Haulderman, 2011 WL 830331, *2 (M.D. Pa. 2011) (quoting FED. R. CIV. P. 56(e)(2)). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true. Big Apple BMW, Inc. v. BMW of North America. Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## II. Statement of Material Facts

"A motion for summary judgment filed pursuant to FED. R. CIV. P. 56 shall be accompanied by a separate, short and concise statement of the material facts . . . as to which the moving party contends there is no genuine issue to be tried." See L.R. 56.1. The opposing party shall file a separate statement of the material facts as to which it is contended that there exists a genuine issue to be tried. Id. "All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be

served by the opposing party." Id. Because Franqui-Pagan failed to oppose Defendant's statement of material facts, all facts contained therein are deemed admitted.

On November 4, 2014, Franqui-Pagan was housed in a cell in the Secure Special Needs Unit ("SSNU") at SCI-Benner because he was experiencing mental health issues for which he was taking psychological medications. (Doc. 51, ¶¶ 1, 3). He was housed in the same cell with Ronald Green ("Inmate Green" or "Green"), an inmate who had previously been diagnosed with paranoid-type schizophrenia and bi-polar disorder and who was classified with a mental health stability rating of D, which "designates the most serious need for mental health services." (Id. at ¶ 1). Inmate Green was suicidal and "liked to cut himself a lot." (Id. at 2).

Prior to November 4, 2014, Inmate Green had never harmed any other inmates and was not on razor restriction. (Id. at 14). Franqui-Pagan had been celled with Inmate Green since his arrival on the SSNU, approximately a month or a month and a half earlier. (Id. at 9). Inmate Green never threatened or attempted to hurt Franqui-Pagan. (Id. at 10). Nor had he attempted to harm himself, despite making statements indicating a desire to do so. (Id. at 11). When Green intimated that he may hurt himself, Franqui-Pagan would calm him down and convince him

5

not to hurt himself. (Id. at 12). Franqui-Pagan never told any DOC staff member that he thought Green would hurt him and never reported to any staff member Green's threats to harm himself. (Id. at 13).

On the evening of November 4, 2014, Franqui-Pagan was playing cards outside of his cell, when he saw an unidentified corrections officer stop in front of the cell he shared with Inmate Green. (Id. at 6). Inmate Green had cut himself several times with Franqui-Pagan's razor and was drawing on the walls with his blood. (Id. 4, 8). The unidentified corrections officer summoned Defendant Jackson, who was at the desk in the SSNU. (Id. at 7). Inmate Green was removed to a psychiatric observation cell ("POC") and issued Other Report No. 574045, which "identified [him] as a danger to himself or others," and placed him in administrative custody. (Id. at 4).

While Green was in the POC, Franqui-Pagan spoke with Defendant Jackson about the November 4, 2014 incident and requested that Green not be returned to the cell because he did not "want to be the cause of him cutting himself." (Id. at 15). He did not "want to be [the] person in the cell with him if he's going to cut himself again." (Id. at 16). Jackson advised him that cellmate decisions were not up to him. (Id. at 17).

Green was released from the POC on November 6, 2014, and returned to the cell with Franqui-Pagan.  (Id. at 18).  Defendant Jackson was not working at the time.  (Id. at 19). Three or four days after Green returned, Franqui-Pagan informed Jackson "I don't want this dude in my cell, because he had just cut himself with my razor. I don't want him to hurt himself. I don't want to feel like I'm the cause of him hurting himself or me as well. He just only did 24 hours of observation in that cell. I'm not sure what is up with him. I don't want him to hurt himself or hurt me."  (Id. at 20-22).  Either Defendant Jackson or the unit manager advised him that they could not make any moves because SCI-Benner was in the process of transitioning the SSNU to a new unit.  (Id. at 23).  He never had any other conversations about any fear that Green might harm him with Jackson or anyone else.  (Id. at 24).  Nor did he submit any request slips or grievances regarding his cell assignment with Green.  (Id. at 25).

On November 16, 2014, Green assaulted Franqui-Pagan with Franqui-Pagan's razor.  (Id. at 26).  Franqui-Pagan testified to the following at his deposition:

> Q.  So where --- had Mr. Green ever done anything like this before?
>
> A.  To my knowledge, no.  Like I said he had been cutting himself. I had seen scars on his arm before this incident of November 4 and before that.  I knew like he had problems.  I wasn't sure to

7

what extent that he had problems, you know. I did not know exactly what his problems was.

Q. How about to you, had he ever said anything like I need to cut you or I'm going to cut you?

A. Before that?

Q. To you before this?

A. No. Before that, no, he was just like I said like when we would have arguments and stuff like that. When I would say he wasn't always there, sometimes he'd be talking to himself or sometimes he'd just say little things here and there. I would ignore that. But besides that, no, like he never said anything like that.

(Doc. 50-2, p. 33). Franqui-Pagan could not believe it had happened. (Id. at 36).

When questioned about Jackson's role, he stated as follows:

Q. Do you think that Sergeant Jackson had any reason to know that Mr. Green was going to harm you?

A. Personally, I don't think that he did know, but like I said it's standard protocol. He was there. I mean, he's the regular Sergeant so he knows us. Everybody --- Sergeant would always talk to people. He's that person that I could talk to. Like he knew Mr. Green, like he was there, you know what I'm saying, a lot. That was his Block, so everybody knew Green was --- or whatever the case may be.

So at the time I guess he did not know he was going to hurt me but after that incident it's protocol.

***

> Q. But is there anything specifically that would have let Sergeant Jackson know that Mr. Green was going to hurt you?
>
> A. I guess not. I guess not. Prior to that November 4, I guess not. Do you meant what was going through his head, what he was going --- I did not know he was going to do that November 4, either. I guess he didn't.
>
> ***
>
> Q. Was Sergeant Jackson present on the block when the incident where Mr. Green cut you on November 16?
>
> A. No, ma'am, he was not.

(Doc. 50-2, pp. 42-44, 49).

## III. **Discussion**

Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials. See 42 U.S.C. § 1983. The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Id.; see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws

9

of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).

The Cruel and Unusual Punishment Clause of the Eighth Amendment imposes on prison officials "a duty to protect prisoners from violence at the hands of other prisoners." Farmer, 511 U.S. at 833; Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir. 1997). "Being violently assaulted in prison is simply 'not part of the penalty that criminal offenders pay for their offenses against society.'" Farmer, 511 U.S. at 834 (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). To survive summary judgment on a claim for damages against a prison official for failure to protect an inmate from violence caused by other inmates, as is the case here, a plaintiff must produce sufficient evidence establishing that: (1) he was incarcerated under conditions posing a substantial risk of serious harm (an objective inquiry); (2) the prison official acted with deliberate indifference to the substantial risk to his health and safety (a subjective inquiry); and, (3) the prison official's deliberate indifference caused him harm. Bistrian v. Levi, 696 F.3d 352, 367 (3d Cir. 2012) (citing Farmer, 511 U.S. at 834; Hamilton, 117 F.3d at 746).

A.  Objective Inquiry

"[An inmate plaintiff] must show 'a pervasive risk of harm to inmates from other prisoners'" in order to show prison conditions posing a substantial risk of

harm arising from an inmate on inmate assault. Riley v. Jeffes, 777 F.2d 143, 147 (3d Cir. 1985) (quoting Woodhous v. Virginia, 487 F.2d 889, 890 (4th Cir. 1973)) (emphasis added). "A pervasive risk of harm may not ordinarily be shown by pointing to a single incident or isolated incidents, but it may be established by much less than proof of a reign of violence and terror." Id. (quoting Shrader v. White, 761 F.2d 975, 978 (4th Cir. 1985)).

Franqui-Pagan testified at his deposition that, to his knowledge, Inmate Green had never threatened or assaulted another inmate. He further testified at his deposition that he could not believe Green assaulted him. This testimony highlights that the assault was unexpected and without notice. There is no evidence that Franqui-Pagan was incarcerated under conditions posing a substantial risk of serious harm.

B.  Subjective Inquiry

Even had he met the objective inquiry prong, Defendant Jackson would be entitled to summary judgment as there is no evidence that he possessed actual knowledge that Green presented an excessive risk of harm. "[T]he official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." Beers–Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001). Actual knowledge can exist where "a substantial risk of inmate attacks

was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," and where "circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." Id. (quoting Farmer, 511 U.S. at 842–43). It is insufficient, however, for an official to simply be "aware of facts from which the inference can be drawn that a substantial risk of serious harm exists." Farmer, 511 U.S. at 837.

Although Franqui-Pagan expressed some concern over being celled with Green following his discharge from the POC in indicating to Jackson that he did not want Green "to hurt himself or me," he failed to notify Jackson of any "specific incident or cause of tensions between the cellmates" from which an inference could be drawn that an excessive risk was present. Blackstone v. Thompson, 568 F. App'x. 82, 84 (3d Cir. 2014) (not precedential). His general statements of concern over Green's behavior, which were devoid of a particularized threat of harm, are simply insufficient to demonstrate that Defendant Jackson knew that Franqui-Pagan faced a substantial risk such that Jackson could be considered deliberately indifferent to that risk. Jones v. Beard, 145 F. App'x. 743, 746 (3d Cir. 2005) (not precedential); Jackson v. Everett, 140 F.3d 1149, 1152 (8th Cir.1998) (noting that "threats between inmates are common" and do not, in every circumstance "serve to impute actual knowledge of a substantial risk of harm")

12

(citations and internal quotations omitted). More compelling is Franqui-Pagan's deposition testimony wherein he specifically states that he did not believe that Jackson knew that Green was going to harm him. Farmer, 511 U.S. at 846 (noting that to defeat summary judgment a plaintiff must present enough evidence to support the inference that the prison official "knowingly and unreasonably disregarded an objectively intolerable risk of harm").

## IV. Conclusion

Based on the foregoing, Defendant's motion (Doc. 48) for summary judgment is deemed unopposed and will be granted.

An appropriate Order will enter.

BY THE COURT:

s/James M. Munley
**JUDGE JAMES M. MUNLEY**
**United States District Court**

Dated: October 31, 2017